566UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PETER BIRMINGHAM; and BIRMINGHAM
SOFTHANDS INFIELD TRAINER CO., INC.,
                           Plaintiffs,

v.                                                              5:09-CV-0566
                                                                (GTS/GHL)
MIZUNO USA, INC.,
                           Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

MELVIN & MELVIN, PLLC                           KENNETH J. BOBRYCKI, ESQ.
   Counsel for Plaintiffs                       ELIZABETH A. GENUNG, ESQ.
217 S. Salina Street, 7th Floor                 J. MATTHEW VAN RYAN, ESQ.
Syracuse, New York 13202

HANCOCK ESTABROOK, LLP                          ASHLEY D. HAYES, ESQ.
   Counsel for Defendant
1500 AXA Tower I, 100 Madison Street
Syracuse, New York 13202

TROUTMAN SANDERS LLP                            JOHN M. BOWLER, ESQ.
   Counsel for Defendant
Bank of America Plaza, Suite 500
600 Peachtree Street, N.E.
Atlanta, Georgia 30308

HON. GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

Currently before the Court, in this trademark infringement action filed by Peter

Birmingham and Birmingham Softhands Infield Trainer Co. ("Plaintiffs") against Mizuno USA,

Inc. ("Defendant"), are Plaintiffs' motion for partial summary judgment (Dkt. No. 22), and

Defendant's motion for summary judgment (Dkt. No. 23).  For the reasons set forth below, both

motions are granted in part and denied in part.

## TABLE OF CONTENTS

I.      RELEVANT BACKGROUND...........................................................................3
        A.      Plaintiffs' Claims......................................................................3
        B.      Plaintiffs' Motion......................................................................4
        C.      Defendant's Motion....................................................................5
        D.      Undisputed Material Facts.........................................................6

II.     RELEVANT LEGAL STANDARDS .........................................................10

III.    ANALYSIS...............................................................................................10
        A.      Plaintiffs' Claims Under the Lanham Act..................................10
                1.      The Mark's Validity and Entitlement to Protection.................11
                2.      Likelihood of Confusion...............................................16
                        a.      Whether Defendant's Use of the Mark Was Counterfeit Use.......16
                        b.      *Polaroid* Analysis..............................................18
                                i.      Strength of Plaintiffs' Mark............................19
                                ii.     Similarity of the Marks................................22
                                iii.    Proximity of Parties' Products in Marketplace...............23
                                iv.     Likelihood that Plaintiffs Will "Bridge the Gap"
                                        Between the Products.....................................25
                                v.      Actual Consumer Confusion Between the Two Marks....26
                                vi.     Defendant's Intent in Adopting the Mark........................27
                                vii.    Quality of Defendant's Product................................31
                                viii.   Sophistication of Relevant Consumer Group...................31
                3.      Balance of Equities..................................................33
        B.      Plaintiffs' Claim Under Federal Trademark Counterfeiting Act................34
        C.      Plaintiffs' Claim Under New York Trademark Dilution Law......................35
        D.      Plaintiffs' Claim Under New York Deceptive Trade Practices Act..................37
        E.      Plaintiffs' New York Common Law Claims of Unfair Competition
                and Trademark Infringement......................................................38

IV.     PLAINTIFFS' REQUEST FOR EQUITABLE RELIEF...............................39

V.      PLAINTIFFS' REQUEST FOR MONETARY RELIEF AND FEES............................40

I.      **RELEVANT BACKGROUND**

A.      **Plaintiffs' Claims**

On May 13, 2009, Plaintiffs filed this trademark infringement action pursuant to 15

U.S.C. § 1051, *et seq.* (hereinafter "Lanham Act") and related New York State laws.  Generally,

Plaintiffs' Complaint alleges that Defendant's adoption and use of the phrase "Softhands"

infringes on Plaintiffs' rights as registrants of that mark because (1) it has caused, and is likely to

continue to cause, confusion in the marketplace, and (2) it has caused, and will continue to cause,

substantial injury and financial loss to Plaintiffs.  (Dkt. No. 1.)  Based on these factual

allegations, Plaintiffs assert the following seven counts against Defendant: (1) trademark

infringement under the Lanham Act, 15 U.S.C. § 1114 ("Count One"); (2) false designation of

origin under the Lanham Act, 15 U.S.C. § 1125 ("Count Two"); (3) manufacture, distribution

and sale of counterfeit goods under the Lanham Act, 15 U.S.C. §§ 1114 and 1116 ("Count

Three"); (4) violation of 18 U.S.C. § 2320, the federal Trademark Counterfeiting Act of 1984

("Count Four"); (5) trademark dilution under N.Y. Gen. Bus. Law § 360, *et seq*. ("Count Five");

(6) violation of N.Y. Gen. Bus. Law § 133, the New York Deceptive Trade Practices Act

("Count Six"); and (7) unfair competition and trademark infringement under New York common

law ("Count Seven").  (*Id.*)

As relief for their injuries, Plaintiffs request the following: (1) a preliminary and

permanent injunction; (2) a recall, seizure and destruction of all goods manufactured, distributed,

offered for sale and sold by Defendant using the "Softhands" mark; (3) an accounting of the

profits and actual damages suffered by Plaintiffs as a result of Defendant's actions of

infringement, false designation of origin, unfair competition, and unfair and deceptive trade

practices, as well as treble damages and interest; (4) the surrender for destruction of all materials incorporating or reproducing the "Softhands" mark; (5) attorney's fees; (6) a one-million-dollar fine levied against Defendant for violations of the Federal Trademark Counterfeiting Act of 1984; (7) punitive damages pursuant to the common law causes of action in the amount of ten million dollars; and (8) any other relief deemed just and equitable by this Court. (*Id.*)

### B.  Plaintiffs' Motion

On May 4, 2010, Plaintiffs filed a motion for partial summary judgment. (Dkt. No. 22.) In their motion, Plaintiffs request summary judgment on Counts One, Two and Three of their Complaint. (*Id.*)  Generally, in support of their motion, Plaintiffs argue as follows: (1) the registered mark "Softhands" is not "generic"; (2) as the owners of a valid mark, they are entitled to protection; (3) the *Polaroid* balancing test demonstrates a likelihood of confusion; and (4) Defendant's actions constitute trademark infringement.  (*See generally* Dkt. No. 22, Attach. 10 [Plfs.' Memo. of Law].)  Plaintiffs further argue that, upon granting summary judgment, the Court should do the following: (1) permanently enjoin Defendant from further unauthorized use of Plaintiffs' Registered Mark; (2) recall and destroy all products of Defendant bearing Plaintiffs' registered mark (i.e., "Softhands"); (3) ban all further imports of such products; (4) order an accounting of Defendant's sales of infringing goods; (5) award Plaintiffs treble the amount of Defendant's profits resulting from their use of Plaintiffs' registered mark; and (6) compel Defendant to pay Plaintiffs' attorney fees together with the costs of this action, and any other relief the Court deems just and equitable.  (*Id.*)

C.       **Defendant's Motion**

Later on May 4, 2010, Defendant filed a motion for summary judgment on all of

Plaintiffs' claims.  (Dkt. No. 23.)  Generally, in support of its motion, Defendant argues as

follows: (1) Plaintiffs' Lanham Act claims should be dismissed because Plaintiffs have failed to

adduce admissible record evidence from which a rational factfinder could conclude that

Defendant's use of the words "Softhands Construction" creates a likelihood of confusion; (2)

Plaintiffs' counterfeiting claims should be dismissed because Plaintiffs have failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant's use

of the words "Softhands Construction" resulted in the counterfeit use of Plaintiffs' mark; (3)

Plaintiffs' New York dilution claim should be dismissed because Plaintiffs have failed to adduce

admissible record evidence from which a rational factfinder could conclude that (a) Plaintiffs'

mark is truly distinctive or well-known, (b) Defendant's use of the words "Softhands

Construction" creates a likelihood of dilution by blurring or consumer tarnishing, or (c)

Defendant had the requisite predatory intent in adopting the mark; (4) Plaintiffs' deceptive trade

practices claim should be dismissed because Plaintiffs have failed to adduce admissible record

evidence from which a rational factfinder could conclude that Defendant's use of the words

"Softhands Construction" was intended to deceive or mislead the public; (5) Plaintiffs' state

common law claims for trademark infringement and unfair competition should be dismissed

because Plaintiffs have failed to adduce admissible record evidence from which a rational

factfinder could conclude that (a) Defendant's use of the words "Softhands Construction" creates

a likelihood of confusion, or (b) Defendant used the words "Softhands Construction" in bad

faith; and (6) Plaintiffs' requests for other relief should be denied because Plaintiffs have failed

5

to adduce admissible record evidence that there is any threat of repetition or plan to reuse the

mark to describe any of Defendant's products.  (Dkt. No. 25 [Def.'s Memo. of Law].)[1]

### D.      Undisputed Material Facts

In 1988, Peter Birmingham (hereafter "Mr. Birmingham") founded Birmingham

Softhands Infield Trainer Co., Inc. (hereafter "Birmingham Softhands") in New York.

(*Compare* Dkt. No. 24, at ¶ 1 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶ 1 [Plfs.'

Rule 7.1 Response].)  Birmingham Softhands is a company wholly owned by Mr. Birmingham

and his wife.  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 9 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49, at

¶ 9 [Def.'s Rule 7.1 Response].)

On December 19, 1995, Mr. Birmingham became the owner of the trademark

"Softhands" (United States Trademark Registration No. 1942544, registered December 19,

1995), which described "a hand-held catching device used for improving baseball skills and for

playing baseball related games."  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 7 [Plfs.' Rule 7.1 Stmt.]

*with* Dkt. No. 49, at ¶ 7 [Def.'s Rule 7.1 Response].)  After registration of the mark and five

consecutive years of continuous use of the mark, Mr. Birmingham's rights in the Softhands

trademark became incontestable, pursuant to the provisions of Section 15 of the Lanham Act (15

U.S.C. § 1065).  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 8 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49,

at ¶ 8 [Def.'s Rule 7.1 Response].)

Defendant is a sporting goods manufacturer whose products and apparel are used by

---

[1]      The reason the Court does not characterize Defendant's motion as a "cross-motion" is that it seeks relief that appears predominantly dissimilar to that requested by Plaintiffs, who moved for summary judgment on only three of the seven counts of their Complaint.  *See Horton v. Williams*, 08-CV-0513, 2010 WL 3338920, at *2 & n.2 (N.D.N.Y. Aug. 24, 2010) (Suddaby, J.) (discussing the characteristics of a "cross-motion").

professional and amateur sports teams and athletes.  (*Compare* Dkt. No. 24, at ¶ 39 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1 [Plfs.' Rule 7.1 Response].)  In 2002, Defendant chose the term "Softhands Construction" to describe a new technology used in leather playing baseball gloves that featured a softer, thinner steer hide and "reverse welting" (i.e., welting in which the "stitching" has been moved from the interior to the exterior of the finger stalls) in order to stabilize the fingers and remove excess material from the finger stalls, and provide superior comfort, fit and performance.  (*Compare* Dkt. No. 24, at ¶ 42 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶ 42 [Plfs.' Rule 7.1 Response].)  Defendant thought that the term "Softhands Construction" was appropriate for its new technology because good baseball fielders are commonly referred to as having "soft hands."  (*Compare* Dkt. No. 24, at ¶ 46 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶ 46 [Plfs.' Rule 7.1 Response].)  Prior to use, Defendant did not consult an attorney, conduct a trademark search of the name "Softhands Construction," or apply for a trademark registration.  (*Compare* Dkt. No. 24, at ¶¶ 47-49 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶¶ 47-49 [Plfs.' Rule 7.1 Response].) Nonetheless, Defendant used the common law "TM" symbol in the design and descriptive text as "Softhands™ Construction," "Softhands™ construction," and "Softhands™ Technology." (*Compare* Dkt. No. 24, at ¶ 69 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶ 69 [Plfs.' Rule 7.1 Response].)

From 2003 to 2006, Defendant sold baseball gloves featuring "Softhands Construction" to indicate a feature in its Legacy series, Classic series and Mizuno Pro series gloves.  (*Compare* Dkt. No. 22, Attach. 1, at ¶¶ 12-13 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49, at ¶¶ 12-13 [Def.'s Rule 7.1 Response].)  By July of 2006, Defendant stopped selling, and temporarily stopped

distributing, gloves that physically contained the "Softhands Construction" technology because, among other things, the gloves were not selling well.  (*Compare* Dkt. No. 24, at ¶¶ 71-72 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶¶ 71-72 [Plfs.' Rule 7.1 Response].)

In December of 2006, Mr. Birmingham wrote a letter to Defendant demanding that it cease and desist its use of the word "Softhands" on all sporting goods.  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 18 [Plfs.' Rule 7.1 Stmt.] *and* Dkt. No. 1, Ex. D [Plfs.' Compl.] *with* Dkt. No. 49, at ¶ 18 [Def.'s Rule 7.1 Response].)  In a response letter dated January 18, 2007, Defendant acknowledged receipt of Mr. Birmingham's letter and stated, in part, "Without waiver of any rights, remedies or defenses, which are expressly reserved, and without addressing substantively the claims set forth in your letter, for business reasons Defendant had already ceased use of the term 'soft hands construction' and does not have plans for use of the term in the future." (*Compare* Dkt. No. 22, Attach. 1, at ¶ 19 [Plfs.' Rule 7.1 Stmt.] *and* Dkt. No. 1, Ex. E [Plfs.' Compl.] *with* Dkt. No. 49, at ¶ 19 [Def.'s Rule 7.1 Response].)  Relying on this representation, Plaintiffs did not bring a legal action against Defendant in 2007.  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 20 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49, at ¶ 20 [Def.'s Rule 7.1 Response].)

Nonetheless, in January of 2008, Defendant filled an "internal (nonrevenue) order"[2] of six remaining gloves bearing the "Softhands Construction" technology feature to "clear up

---

[2]     A "nonrevenue order" is a "no charge" order filled on a "promotional" basis to clear up inventory; such an order will be placed when Defendant has inventory or returns remaining on a discontinued item.  (Dkt. No. 47, at ¶ 14 [Rumer Decl., Ex. A].)  The Court further notes that the fact that the order was nonrevenue is immaterial to the case.  *See The Apollo Theater Found., Inc. v. W. Int'l Syndication*, 02-CV-10037, 2005 WL 1041141, at *10 (S.D.N.Y. May 5, 2005) ("[A] defendant need not turn a profit from infringing a trademark in order for the plaintiff to suffer damages from the infringement."); *cf. Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc,* 807 F.2d 1110, 1118 (2d Cir. 1986) ("[The] fact that the infringer made no profit is hardly a reason to deny plaintiff its actual damages for copyright infringement.").

inventory."  (*Compare* Dkt. No. 24, at ¶ 76 [Def.'s Rule 7.1 Stmt.] *with* Dkt. No. 52, Attach. 1, at ¶ 76 [Plfs.' Rule 7.1 Response].)  Later, in August of 2008, Defendant received a "special make up" order placed by one of its retail customers, Sports Diamond, for twelve lime green baseball gloves, identified as model GCS 1150D.  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 21 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49, at ¶ 21 [Def.'s Rule 7.1 Response].)[3]  Some of Defendant's employees approved and filled the order.  (*Compare* Dkt. No. 22, at ¶ 22 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49, at ¶ 22 [Def.'s Rule 7.1 Response].)  Although the gloves did not physically contain the "Softhands Construction" technology, or bear the "Softhands Construction" design on the glove's finger stall, a hang tag was attached to each glove describing the glove as "offering high quality ball gloves that feature innovative technology like Softhands™ construction . . . ."  (*Compare* Dkt. No. 22, Attach. 1, at ¶ 23 [Plfs.' Rule 7.1 Stmt.] *with* Dkt. No. 49, at ¶ 23 [Def.'s Rule 7.1 Response].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Local Rule 7.1 Statements and Local Rule 7.1 Responses, is assumed in this Decision and Order, which is intended primarily for the review of the parties.

---

[3]  A "special make up" (or "SMU") order may be approved by Defendant at the special request of certain customers.  (Dkt. No. 22, Attach. 4, at 36, 39-40 [Grapenthin Dep., Ex. B].)  The gloves comprising a "special make up" order are manufactured by Defendant based on Mizuno models already in use but may contain different materials than normal.  (*Id.*)  Here, the retailer Sports Diamond requested a unique high-end glove that Defendant manufactured using leather from Japan.  (*Id.*)

## II.      RELEVANT LEGAL STANDARD

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

## III.     ANALYSIS

### A.      Plaintiffs' Claims Under the Lanham Act[4]

As stated above in Part I.B. of this Decision and Order, Plaintiffs seek summary judgment on their Lanham Act claims because (1) the record establishes that they are the owners of the registered mark "Softhands," which is valid and not "generic," and (2) the *Polaroid* factors establish a likelihood of confusion.  Conversely, Defendant seeks dismissal of these claims because Plaintiffs have failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant's use of the words "Softhands Construction" creates a likelihood of confusion.

The Lanham Act bars, *inter alia*, the unauthorized use of a mark "in commerce . . . in connection with the sale, offering for sale, distribution, or advertising of any goods or services [if] . . . such use is likely to cause confusion. . . ." 15 U.S.C. § 1114(1)(a).  Generally, to prevail

---

[4]      "The same analysis applies" to claims for "liability for trademark infringement, under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), and for false designation of origin or unfair competition, under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)."  *Chloe v. DesignersImports.com USA, Inc*., 07-CV-1791, 2009 WL 1227927, at *5 (S.D.N.Y. Apr. 30, 2009).

on a trademark infringement action under the Lanham Act, a plaintiff must demonstrate (1) the mark's validity and entitlement to protection, and (2) a likelihood of confusion.  *See Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir. 1997).

### 1.    The Mark's Validity and Entitlement to Protection

When determining the validity of Plaintiffs' mark, "the fact that the USPTO accepted [Plaintiffs'] mark for registration creates a presumption that the mark is valid." *Lemme v. Nat'l Broad. Co., Inc.,* 472 F. Supp. 2d 433, 442 (E.D.N.Y. 2007) (citing *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 [2d Cir. 2001]).  "Such registration constitutes prima facie evidence of [Plaintiffs'] right to use the [mark] . . . ." *Lemme*, 472 F. Supp. at 443.  Generally, after registration of the mark and five consecutive years of continuous use of the mark, the registrant's rights in the mark become incontestable.  15 U.S.C. § 1065.  Once a registered mark has become incontestable, its registration "shall be conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce."  *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993) (citing 15 U.S.C. § 1065).  Under such circumstances, "[t]he burden of production therefore shifts to Defendant to proffer evidence that the mark is not valid, i.e., that it is [not entitled to protection]." *Lemme*, 472 F. Supp. at 443.

Here, Plaintiffs are the owners of the registered mark "Softhands" and had–before the time in question–used the mark continuously for at least five consecutive years since its registration (in 1995).  As a result, the Court finds that Plaintiffs' mark is (and was during the time in question) incontestable.  As a result, Defendant must overcome the incontestible status of Plaintiff's mark.

To overcome the incontestable status of a mark, a defendant must either (1) demonstrate that the mark has become generic,[5] or (2) establish one of the defenses set forth in 15 U.S.C. §§ 1115(b)(1)-(9).[6]  In the event the defendant cannot demonstrate that the mark is generic, and/or establish one of the defenses set forth in 15 U.S.C. §§ 1115(b)(1)-(9), protectability is established; the success of the plaintiff's claim then depends upon a showing of a likelihood of confusion.  *Lois Sportswear, U.S.A., Inc.*, 631 F. Supp. at 740.

Here, Defendant argues that, because the mark is generic, it is not entitled to protection.[7]  "The degree to which a mark is entitled to protection depends on whether the mark is classified as (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary."  *The Gap, Inc.*, 108 F.3d at 1508.  "A mark is generic if, in the mind of the purchasing public it does not distinguish

---

[5]    *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 105 S. Ct. 658, 662 (1985) ("An incontestable mark that becomes generic may be canceled at any time pursuant to § 14(c).").

[6]    *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 867 (2d Cir. 1986).

[7]    The Court notes that, in its answer, Defendant pleads some of the affirmative defenses set forth in 15 U.S.C. § 115(b).  (Dkt. No. 11, at ¶¶ 32-35.)  However, Defendant references the affirmative defense of only laches in its memorandum of law.  (Dkt. No. 25, at 28 n. 22.)  As a result, in deciding the pending motion, the Court need not (and does not) consider the other affirmative defenses asserted in Defendant's Answer.  With regard to the affirmative defense of laches, the Court finds that, although the record establishes that Plaintiffs waited approximately one year to contact Defendant after learning of Defendant's use of Plaintiffs' mark, under the circumstances, the affirmative defense of laches does not apply to such a delay. *See Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp.2d 217. 252 (S.D.N.Y. 2004) ("Defendants' laches defense fails because plaintiffs did not have knowledge of defendants' use of its marks until approximately one year before filing their complaint . . . . Any delay in filing suit was therefore minimal.").  The Court would add only two points.  First, it rejects Defendant's argument that it was "unduly prejudiced" by this delay because "but for Plaintiffs' delay, [it] could have changed its technology name in 2003."  (Dkt. No. 25, at 28 n. 22.)  Clearly, any prejudice Defendant suffered in 2003 could not have been avoided by Defendant being notified of its infringement in "late 2005."  Second, the record establishes that Defendant notified Plaintiffs in early 2007, less than one month after Plaintiffs sent Defendant a cease-and-desist letter, that it "had already ceased use of the term 'soft hands construction' and d[id] not have plans for any use of the term in the future."  This explains why Plaintiffs waited more than two years, from the time they sent Defendant a cease-and-desist letter, to file suit.

products on the basis of source but rather refers to the type of product." *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 214 (2d Cir. 2003).  A generic mark represents a "common description of products." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt.*, 192 F.3d 337, 344 (1999).  "A generic term is a common name, like automobile or aspirin, that describes a kind of product." *Gruner + Jahr USA Publ'g*, 991 F.2d at 1075.  In that regard, a generic mark is "totally lacking in distinctive quality." *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2001).  Because a generic mark is not distinctive, it is not protectable under the Lanham Act.  *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 385 (2d Cir. 2005).

In contrast, a descriptive mark "is one that tells something about a product, its qualities, ingredients or characteristics." *Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.  "It may point to a product's intended purpose, its function or intended use, its size, or its merit." *Id*.  Descriptive marks are protectable under the Lanham Act when they acquire a secondary meaning.  *Star Indus., Inc.*, 412 F.3d at 385.  This secondary meaning is referred to as "acquired distinctiveness."  *Id*.  "[A] descriptive mark may attain secondary meaning in two ways: it may be proved as a matter of fact that the mark connotes a single source of origin to the public consumer or secondary meaning may be established through registration of a trademark." *Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.

Suggestive marks are inherently distinctive.  *Star Indus., Inc.*, 412 F.3d at 385. "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception." *Id*. (internal quotation marks omitted).  Therefore, while a descriptive mark "tells something about a product, its qualities, ingredients, or characteristics," a suggestive mark "suggests the product, though it may take imagination to grasp the nature of the product." *The Gap Inc.*, 108 F.3d at 1509 (internal

quotation marks omitted).  "The distinction between a descriptive and suggestive marks is that the former may be protected only if it has acquired secondary meaning, while a suggestive mark is protected without a showing of secondary meaning."  *Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.  "The line between the two is quite a difficult one to draw."  *Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575, 584 (S.D.N.Y. 2009) (internal quotation marks omitted).

"Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion."  *Star Indus. Inc.*, 412 F.3d at 385.  "An arbitrary mark applies a common word in an unfamiliar way[, and] [a] fanciful mark is not a real word at all, but is invented for its use as a mark."  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (1999).  "Among marks relying solely on inherent distinctiveness for their protectability, arbitrary or fanciful ones are the strongest."  *Star Indus. Inc.*, 412 F.3d at 385.

Here, the Court agrees that the phrase "soft hands" is a term commonly used to describe the effortless catching ability of a fielder, or quick releasing ability of a catcher, in baseball (or softball).  *See, e.g.*, Paul Dickson, *The New Dickson Baseball Dictionary*, at 464 (Mariner Books 1999).  However, the Court disagrees that the connection between the phrase "soft hands" and a product designed to improve a baseball player's fielding ability are things in such close proximity to one another to support a finding that the mark is generic.  This is because the mark "Softhands" does not refer to the type of product in question, unlike such unprotectable marks as aspirin and automobile.  For example, the mark "Softhands" could refer to a baseball player's compression wristband, or leather conditioner (for a baseball glove).  Moreover, the mark "Softhands" could refer to equipment used by non-baseball players.[8]  In addition, while the

---

[8]        The Court takes judicial notice of the fact that the term "soft hands" is sometimes used to refer to (1) a tennis player with a good feel at the net, (2) a hockey player who is skilled

words "soft" and "hands" on their own are both sufficiently generic, when consolidated into a single word, they "make up a composite more distinctive than the sum of its parts."  *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993), *superceded on other grounds*, *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994) (upholding district court ruling that separately "sport" and "stick" are rather generic, but the consolidation into a single word "requires some imagination to surmise the nature of the product" which therefore "is the essence of a suggestive mark").

Furthermore, the Court notes that, in its most basic form, Plaintiffs' product is one that slides over the hand and absorbs (or braces a player against) the impact of a ball through the use of a foam cushion.  As a result, the Court finds that the mark "sufficiently evoke[s] the characteristics of the product  . . . ."  *W.W.W. Pharm. Co.*, 984 F.2d at 572 (quoting *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 808 F. Supp. 1013, 1022 [S.D.N.Y. 1992]).  For example, the product, which is a baseball training device, has as its purpose teaching players how to properly field ground balls by having "soft hands."  As a result, unlike in *W.W.W. Pharm. Co.* (in which the Southern District of New York held that the mark "Sportstick," as it pertains to lip balm, was suggestive), the Court finds that "Softhands" mark is descriptive because it uses a term of art commonly used within the baseball community, and it conveys something about Defendants' product, such as its qualities, components or characteristics.  The Court notes that Plaintiffs

---

at the technique of deceiving an opponent by moving left to right or vice versa, (3) a golfer who passively turns over his hands to release the club at the right moment, or (4) a football receiver who catches the football with relaxed hands.  *See, e.g.*, "Tennis Slang," www.notanothershank. com/tennis-slang/ [last visited Nov. 18, 2010]; "Urban Dictionary," www.urbandictionary.com/ define.php?term=soft+hands  [last visited Nov. 18, 2010], "Soft Hands in the Golf Swing," www.golfgist.com/golf-soft-hands.html [last visited Nov. 18, 2010]; "UB Football Coach Briefs 'Clinic' Youngsters on Game," *The Bridgeport Post* at 12 (Aug. 20, 1970).  In addition, the Court notes that, historically, the term has been used by some to describe the hands of a person who performs little or no manual labor.  Samuel Fallows, *The Progressive Dictionary of the English Language* at 430 (Progressive Publ'g Co. 1885).

appear to acknowledge the descriptiveness of their product, stating that their product "[d]evelops the 'Soft Hands' Of Premier Fielders Like Derek Jeter."  (Dkt. No. 1, Ex. B.)

Turning to the requirement of secondary meaning, where a plaintiff has an incontestable mark due to his having used it continuously for five consecutive years after registering it, a defendant in an infringement suit "may not succeed in a defense that declares the mark is entitled to no protection because it is descriptive."  *Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.   As a result, the Court finds that "Softhands" is a valid mark, entitled to protection.

### 2.      Likelihood of Confusion

In general, when considering the likelihood of confusion, courts in the Second Circuit apply the eight-factor analysis in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  However, for counterfeit marks, the Court may bypass a factor-by-factor analysis under *Polaroid* because "counterfeit marks are inherently confusing."  *Colgate-Palmolive Co. v. J.M.D. All-Star Import and Export Inc.*, 486 F. Supp. 2d 286, 289-90 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[T]he Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion.").

### a.      Whether Defendant's Use of the Mark Was Counterfeit Use

In Count Three of Plaintiffs' Complaint, Plaintiffs allege that Defendant engaged in a "counterfeit" use of their protected mark.  The Lanham Act permits the owner of a registered mark to recover against those who "use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  Under

the Lanham Act, the term "counterfeit" is defined as the use of a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127. "This test of 'identical with, or substantially indistinguishable from' requires a closer degree of similarity than is required for traditional trademark infringement or unfair competition."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:10 (2005) (stating that, although no precedent exists which articulates the precise distinction between the similarity standard of counterfeiting as compared to the similarity analysis in the likelihood of confusion standard, "the counterfeit statute's more rigorous test is quite clear").  In addition, "[t]he Second Circuit has stated that an allegedly counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser."  *J.M.D. All-Star Import and Export Inc.*, 486 F. Supp. 2d at 289 (citing *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 533 [2d Cir. 1983]).

Here, the Court finds that the marks in question are not so indistinguishable as to support Plaintiffs' counterfeit claim.  Although both parties combine "Softhands" into one word, the visual appearances of the marks differ too much for them to be considered "identical" or "substantially indistinguishable."  For example, Plaintiffs' "Softhands" mark is written in bubble font with the "o" of the word appearing in the triangular shape of the actual training device (complete with the oval shape of the finger grips in the middle of the triangular shape), while Defendant's words "Sofhands Construction" appear in a considerably different font with the words semi-enclosed by a graphic wave design.  In addition, Defendant does not use the word "Softhands" by itself; rather, Defendant uses the word in tandem with the word "Construction." Finally, not only are the two designs differ both graphically and stylistically, they are placed on products that are substantially distinguishable.  For these reasons, the Court finds that

17

Defendant's use of the word "Softhands" is not an "exact duplicate" as argued by Plaintiffs; and Plaintiffs' motion for summary judgment on Count Three is denied.

The Court will now turn to a more complete analysis of the *Polaroid* factors in order to address Counts One and Two of Plaintiffs' Complaint.

### b.   *Polaroid* **Analysis**

To make a finding of infringement, "a probability of confusion, not a mere possibility, must exist." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739 (2d Cir. 1998); *see also The Gap, Inc.*, 108 F.3d at 1510. To determine whether there is a likelihood of confusion, Courts in the Second Circuit balance the following eight factors: (1) strength of the trademark; (2) the similarity of the marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. *See Star Indus., Inc.*, 412 F.3d at 384 (citing *Polaroid*, 287 F.2d at 495).

"Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Road Dawgs Motorcycle Club of the U.S., Inc. v. "Cuse" Road Dawgs, Inc.*, 679 F. Supp. 2d 259, 285 (N.D.N.Y. 2009) (Suddaby, J.) (quoting *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004). "In general, no single factor should be treated as dispositive." *"Cuse" Road Dawgs, Inc.*, 679 F. Supp. 2d at 285 (quoting *Lemme*, 472 F. Supp. 2d at 446). In addition, an analysis of the *Polaroid* factors is not "a mechanical process by which the party with the greatest number of factors wins." *Id*. "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused." *Id*. For the reasons that follow, the Court finds that a likelihood of confusion does in fact exist

between Plaintiffs' "Softhands" mark and Defendant's use of the word "Softhands."

### i.        Strength of Plaintiffs' Mark

The parties dispute the strength of Plaintiffs' mark.  "The strength of a mark is determined by its tendency to uniquely identify the source of the product."  *Star Indus., Inc.*, 412 F.3d at 384.  "The tendency is strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired a secondary meaning.  *Id*.  "Turning on its 'origin-indicating' quality in the eyes of the purchasing public, a mark's strength is assessed using two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace."  *W.W.W. Pharm. Co.*, 984 F.2d at 572.  "Once a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the 'inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question.'"  *Star Indus.*, 412 F.3d at 385 (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:81, at 11:159 (2005).

As stated above in Part III.A.1. of this Decision and Order, the Court finds that, for purposes of protectability, Plaintiffs' mark is descriptive; and the mark possesses strong secondary meaning by virtue of its incontestible registration.  *See Gruner + Jahr USA Publ'g.*, 991 F.2d at 1076.   Therefore, although the degree of inherent distinctiveness is not superior based on the mark's classification as descriptive, the Court finds that Plaintiffs' mark has achieved strong acquired distinctiveness.

However, Defendant correctly argues that, regardless of the determination made as to the mark's protectability, such a determination is not dispositive of the mark's strength.  *See Gruner*

19

+ *Jahr USA Publ'g*, 991 F.2d at 1077 (upholding district court's distinction between the "strength of the trademark PARENTS and the weak, descriptive nature of what it called the 'mere word parents'").  As the Second Circuit explained in *Gruner*, "[o]n other occasions, we have found [that] the strength of an incontestable registered trademark could be overcome by the use of a descriptive or weak portion of the mark."  *Gruner + Jahr USA Publ'g*, 991 F.2d at 1077 (citing *W.W.W. Pharm. Co.*, 984 F.2d 567).  As a result, even when a determination is made that secondary meaning exists by virtue of a mark's incontestible registration, the Second Circuit often still looks for additional evidence of secondary meaning.  *See W.W.W. Pharm. Co.*, 984 F.2d at 572-73 (finding that an incontestible registered mark, which was suggestive for distinctive purposes, was nevertheless only "moderately strong").

Factors considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."  *Therapy Prod., Inc. v. Bissoon*, 623 F. Supp.2d 485, 494 (S.D.N.Y. 2009) (quoting *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n. 4 [2d Cir. 1997]).  In addition, in *Gruner,* the Second Circuit looked to the commonality of the trademarked word, as well as the similarity (or lack thereof) between the mark and the alleged infringing logo.  *Gruner + Jahr USA Publ'g*, 991 F.2d at 1078 ("In analyzing the strength of the mark for likelihood of confusion purposes, . . . the actual trademark registration . . . protects not the name or the word 'parents,' but rather the stylized logo of that name including the unusual form and shape of the letters comprising the word.  Any presumption of distinctiveness for likelihood of confusion purposes is lessened by the dissimilarity of the two magazine logos before us.  The fact that the term 'parents' resides in the public domain . . .

20

lessens the possibility that a purchaser would be confused and think the mark came from a particular single source.").[9]

Here, the Court finds that "Softhands" is not a word or phrase that resides in the public domain.  As an initial matter, the phrase "soft hands" appears to be a term commonly (albeit not exclusively) used to describe a baseball (or softball) player possessing superior fielding ability.  In addition, Plaintiffs' mark is presented, not as two words (i.e., "soft hands"), but as one word (i.e., "Softhands"); this increases both the strength of the mark,[10] and the likelihood of confusion that would result from Defendant's use of the same word.

Furthermore, the Court finds that Defendant's argument that Plaintiffs have not demonstrated a secondary meaning based on marketplace presence is without merit.  Plaintiffs' product has been in the marketplace for more than twenty years.  Plaintiffs have established that, during that time, they sold several hundred thousand Softhands devices.  In addition, Softhands has been endorsed (through Plaintiffs' licensee) by one of the most recognizable players in professional baseball today–New York Yankee's shortstop Derek Jeter.  Finally, Softhands (through Plaintiffs' licensee) is marketed and sold through interstate commerce in baseball equipment catalogs, in retail stores and online.

For these reasons, the Court finds that Plaintiffs' mark has achieved sufficient secondary meaning, and that the "strength of the mark" factor weighs in favor of Plaintiffs.

### ii.     Similarity of the Marks

---

[9]      *See also Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990) (stating the fact that registering a proper noun as a trademark "does not withdraw is from language, nor reduce it to the exclusive possession of the registrant").

[10]     Plaintiffs concede that the phrase "soft hands" "is a common descriptive phrase used to describe exemplary fielding ability or technique of a baseball or softball player."  (Dkt. No. 52, Attach. 2, at 10.)

"The similarity of the marks is a key factor in determining likelihood of confusion." *N.Y. State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 431 (W.D.N.Y. 2010) (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006). This analysis is particularly true when, as here, the plaintiff and defendant "are engaged in the same type of business." *U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d at 431.  "In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Star Indus., Inc.*, 412 F.3d at 386 (quoting *Gruner + Jahr Publ'g Co.*, 991 F.2d at 1078).  "In determining whether the two marks are similar, and therefore likely to provoke confusion among prospective purchasers, courts apprise 'the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'"  *Streetwise Maps, Inc.*, 159 F.3d at 744 (quoting *Gruner + Jahr Publ'g Co.*, 991 F.2d at 1078).

"In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *The Sports Auth.*, 89 F.3d at 962.  "The fact that the two marks appear similar is not dispositive." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004).  Rather, the question is whether such similarity is more likely than not to cause confusion among ordinarily prudent consumers.  *Brennan's, Inc.*, 360 F.3d at 133.

Here, the Court finds that the marks are sufficiently similar to cause consumer confusion. First, both Plaintiffs and Defendant combine the words "soft" and "hands" into one word.  This creates a new and unique word not found in a dictionary.  Second, although Defendant adds the

word "Construction" to the word "Softhands," the word "Construction" is written (or stitched)

beneath the word "Softhands," in much smaller print; and the common law trademark protection

(i.e., TM) is written (or sticthed) next to the word "Softhands," in print larger than is the word

"construction."

Third, while the Court agrees with Defendant that the presentation of the two marks is

different on the respective products,[11] in the catalog description of Defendant's product, the mark

is presented in a typeface that is consistent with the typeface used to present the rest of the

product description and the catalog as a whole.  As a result, a catalog shopper might not have an

adequate opportunity to distinguish the products from one another before purchasing one.

Finally, while the products are somewhat dissimilar, the products are not so dissimilar in

purpose to weigh in favor of Defendant.  For example, Plaintiffs' handheld training device and

Defendant's glove are both used for baseball/softball activities, and, more precisely, fielding

improvement.  For these reasons, the Court finds that this factor weighs in favor of Plaintiffs.

### iii.      Proximity of Parties' Products in Marketplace

"The proximity inquiry asks to what extent the two products compete with each other."

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004).  To analyze this

factor, "the court may consider whether the products differ in content, geographic distribution,

market position, and audience appeal."  *Savin Corp. v. Savin Group*, 391 F.3d 439, 458 (2d Cir.

2004) (quoting *W.W.W. Pharm. Co.*, 984 F.2d at 573).  "If the record indicates that the two

parties operate within the same general market, then such evidence may be sufficient for a

---

[11]      As stated above in Part III.A.2.a. of this Decision and Order, Plaintiffs'
"Softhands" is written in bubble font with the "o" of the word appearing in the triangular shape
of the actual training device (complete with the oval shape of the finger grips in the middle of the
triangular shape), while Defendant's "Sofhands Construction" appears in considerably different
font with the words semi-enclosed by a graphic wave design.

showing of competitive proximity."  *"Cuse" Road Dawgs, Inc.*, 679 F. Supp.2d at 287 (citing *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 149-50 [2d Cir. 2003]).

Defendant argues that marketplace proximity does not exist because its glove is meant primarily for "game" use, while Plaintiffs' product, a handheld catching device, cannot be used in an actual game.  However, this difference does not preclude a finding of marketplace proximity.  *See Star Indus., Inc.*, 412 F.3d at 386 (finding that Georgi vodka and Bacardi rum were in competitive proximity because, although one was rum and the other vodka, and thus different liquors sold in different areas of a liquor store, the two products are nevertheless sold in the same locations and frequented by the same consumers).

Similarly, Defendant's argument that the products are not proximate in the marketplace because Plaintiffs do not sell actual baseball gloves is without merit.  Although Defendant's product is a glove and Plaintiffs' product is a handheld fielding device, both are (1) baseball/softball products, (2) marketed specifically as handheld tools to improve a player's performance on defense, and (3) available for purchase in the same stores, catalogs, and online. *See Star Indus., Inc.*, 412 F.3d at 387.  In addition, it is easily conceivable that a consumer may believe that purchasing Defendant's product (i.e., an expensive glove) negates the need to purchase Plaintiffs' product (and/or believe that Plaintiff's Softhands design is used in the manufacture of Defendant's glove).  The Court would add only that, because a glove and a handheld fielding device have different characteristics, as did the products in *Star*, the finding of competitive proximity in favor of Plaintiffs is "tempered" under the circumstances.  *Star Indus., Inc.*, 412 F.3d at 386-87 ("The [district] court reasoned that while the two 'O' marks appear very similar when viewed in isolation, this similarity is tempered by the fact that the respective packaging is very different . . . .  Our finding of competitive proximity is thus tempered, and the

24

factor does not overwhelmingly favor Star.").

For these reasons, the Court finds that this factor weighs slightly in favor of Plaintiffs.

### iv.   Likelihood that Plaintiffs Will "Bridge the Gap" Between the Products

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus. Inc.*, 412 F.3d at 387.  When the parties' products "are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case." *Star Indus.*, 412 F.3d at 387.

Here, to the extent the "market" is defined somewhat broadly as handheld baseball/ softball fielding products, the parties are already in competitive proximity.[12]  However, to the extent the "market" is defined more narrowly to include only baseball/softball gloves, Plaintiffs have not offered evidence establishing a likelihood of selling gloves in the near future, or that consumers will perceive Plaintiffs as likely to do so.

For these reasons, the Court finds that this factor is neutral.

### v.   Actual Consumer Confusion Between the Two Marks

"For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass of his goods as the goods of another.'"  *The Sports Auth., Inc.,* 89 F.3d at

---

[12]   Again, the Court notes that it is entirely conceivable that a consumer looking to improve his or her fielding abilities may decide between purchasing Defendant's glove and purchasing Plaintiffs' product and a less expensive glove (for use in games).  The Court finds that, in this way, the parties are in competition for the same business.

963 (quoting *W.W.W. Pharm. Co.*, 984 F.2d at 574).  However, "it is black letter law that actual

confusion need not be shown to prevail under the Lanham Act, since actual confusion is very

difficult to prove and the Act requires only a likelihood of confusion as to source."  *Lois*

*Sportswear v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  Conversely, "[t]here can be

no more positive or substantial proof of the likelihood of confusion than proof of actual

confusion."  *Savin Corp.* 391 F.3d at 459.

Here, the Court finds that Plaintiffs have failed to adduce admissible record evidence

establishing actual confusion.  Rather, Plaintiffs have introduced only an email message from

John Schulte, a representative of Plaintiffs' licensee SKLZ.  Because the email message simply

notifies Plaintiffs about Defendant's use of the words "Softhands Construction," it is not

sufficient to establish actual confusion.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,

269 F.3d 114, 124 (2d Cir. 2001) ("Inquiries about the relationship between an owner of a mark

and an alleged infringer do not amount to actual confusion.  Indeed, such inquiries are arguably

premised upon a lack of confusion between the products such as to inspire the inquiry itself.").[13]

This is especially true given that Mr. Schulte testified that he was not confused between the

companies and the products in question.  (Dkt. No. 22, Attach. 6, at 86.)

For these reasons, the Court finds that this factor weighs in Defendant's favor.

### vi.   Defendant's Intent in Adopting the Mark

This factor–sometimes referred to as the "good-faith factor" or "bad-faith factor"–"looks

to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's

reputation and goodwill and any confusions between his and the senior user's product."  *Lang v.*

---

[13]     Plaintiffs concede that any direct evidence beyond the Schulte e-mail message
would be "anecdotal."  (Dkt. No. 22, Attach. 10, at 25.)

*Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991). "Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *W.W.W. Pharm. Co.*, 984 F.2d at 575; *see also The Sports Auth., Inc.*, 89 F.3d at 965 (noting that consulting with an attorney or conducting a trademark search constitutes evidence of good faith). Conversely, "bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Star Indus.* Inc., 412 F.3d at 389; *see also EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 67 (2d Cir. 2000) ("An inference of a lack of good faith may arise from a defendant's use of a plaintiff's mark with the intent to trade upon the good will represented by that mark."). When "the parties' marks are identical, the burden of persuasion rests with defendants regarding their intent in the use of Plaintiffs' marks." *Audi AG v. Shokan Coachworks, Inc.*, 592 F. Supp. 2d 246, 275 (N.D.N.Y. 2008) (McCurn, J.). However, "failure to perform an official trademark search, does not, standing alone, prove that [a] [d]efendant[] acted in bad faith." *Savin Corp.*, 391 F.3d at 460. "Nor is prior knowledge of a senior user's trademark inconsistent with good faith." *Id*.

Here, as an initial matter, as explained above in Part III.A.2.a. of this Decision and Order, although Plaintiffs' mark is substantially similar to Defendant's logo, given the stylistic differences between the two, as well as the fact that Defendant's use of the word "Softhands" always appears in tandem with the word "construction," the Court is unable to conclude that Plaintiffs' mark is identical to Defendant's logo. As a result, the burden of persuasion rests with Plaintiff regarding Defendant's intent in its use of the word "Softhands."

After carefully reviewing the record, the Court finds that Plaintiffs have failed to adduce

admissible record evidence establishing that Defendant (1) had any actual knowledge of

Plaintiffs' product before receiving Plaintiffs' cease-and-desist letter in December 2006,[14] or (2)

*deliberately* intended to exploit Plaintiffs' good will or reputation.[15]  To the contrary, while the

record evidence establishes that Defendant took no steps to avoid possible infringement before

offering into commerce its gloves containing the word "Softhands" (i.e., it did not consult with

an attorney, perform a trademark search or an internet search, or even send sales representatives

---

[14]       Granted, Plaintiffs has adduced some admissible evidence from which a rational factfinder could find the existence of *constructive* notice of Plaintiffs' product by Defendant. For example, Plaintiffs have adduced evidence that (1) their product had been sold continuously in the baseball/softball marketplace since October 1986, and (2) through their licensee, they had released advertising campaigns featuring baseball player Derek Jeter.  However, constructive notice is different from actual knowledge.  Moreover, in any event, "[p]rior knowledge of a senior user's trade mark 'does not necessarily give rise to an inference of bad faith and may be consistent with good faith.'"  *Friesland Brands, B.V. v. Vietnam Nat. Milk Co*., 228 F. Supp.2d 399, 410 (S.D.N.Y. 2002) (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 [2d Cir. 1995]); *see also Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp.2d 241, 254-55 (E.D.N.Y. 2001) (noting that awareness of and copying of another's trade dress does not give rise to inference of bad faith; "[f]or copying to be evidence of confusion the defendant must have copied for the purpose of causing confusion").  "This is particularly true where the alleged infringer is unsure as to the scope of the protection." *Friesland Brands, B.V.*, 228 F. Supp.2d at 410.

[15]       *See W.W.W. Pharm. Co.*, 984 F.2d at 575 (holding that knowledge of an earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, does not constitute good faith), *limited on other grounds by Deere & Co. v. MTD Prods., Inc*., 41 F.3d 39, 46 (2d Cir. 1994); *Lang*, 949 F.2d at 583-84 ("Retirement Living's prior knowledge of Lang's trade name does not give rise to a necessary inference of bad faith, because adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith. . . . [I]n light of the facts leading up to Retirement Living's choice of the mark and the improbability that Retirement Living would choose this mark in the hope of capitalizing on New Choices Press' reputation, the attorneys' forgetfulness fails to raise a genuine issue of fact."); *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 1-CV-8663, 2011 WL 832238, at *13 (S.D.N.Y. Mar. 7, 2011) ("The plaintiffs' assertions of bad faith are belied by the underlying dissimilarity between the Go SMiLE marks and the Glo mark, and the descriptive quality of the Glo mark. . . . The dissimilarities between the parties' marks are contrary to a conclusion that Levine's extensive familiarity with the Go SMiLE marks prompted "deliberate copying" by the defendants. . . ."); *Edison Bros. Stores, Inc. v. Cosmair, Inc*., 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987) (noting that the good faith factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product").

into existing sports stores), the record evidence also establishes that it was not uncommon for it

to conduct business in this manner.[16]  Furthermore, because "soft hands" is a term of art

commonly used in baseball (and softball) circles, it appears quite possible that a designer and

manufacturer of baseball (or softball) gloves could have featured this word on one of its gloves

without intending to cause confusion with regard to Plaintiffs' mark.[17]  This possibility appears

very real under the circumstances, given that Defendant did not begin manufacturing the GXT-1

Trainer, a similar (albeit more expensive) handheld training device, until around the time that it

stopped manufacturing the "Softhands Construction" glove.  (Dkt. No. 28, at ¶ 9 [indicating that

Defendant "retired" the "Softhands Construction" glove in 2005, except for a "couple dozen"

closeout sales in July 2006]; Dkt. No. 33, at 29-30 [testifying that the first sample sale of the

GXT-1 Trainer occurred in May 2006].)[18]  Simply stated, before Defendant became a competitor

of Plaintiffs, there appears to have existed little if any business incentive for it to intend for

consumers of baseball and softball products to confuse its gloves with Plaintiffs' product.

　　　　Granted, the Court acknowledges that Defendant signaled to consumers that its use of the

word "Softhands" was entitled to trademark protection through its use of "TM" next to the word.

However, absent actual knowledge of Plaintiffs' mark and the scope of the protection to which

---

[16]　　　(Dkt. No. 32, at 67-68, 70-72 [testifying that Defendant does not have in-house
counsel, that Defendant's baseball/softball Diamond Division must therefore contact the
company's attorney to perform a trademark search and file an application, and that the
baseball/softball Diamond Division does not always file trademark registrations or perform
trademark searches for its product technology names, but rather "typically seek[s] trademark
protection on Series [products] and above"].)

[17]　　　*See W.W.W. Pharm. Co.*, 984 F.2d at 575 ("Good faith can be found if a
defendant has selected a mark which reflects the product's characteristics . . . .").

[18]　　　The Court notes that Plaintiff Birmingham testified that the GXT-1 Trainer
product is a competing product, but not a "direct[ly]" competing product because it has "a
dramatically different price point."  (Dkt. No. 31, at 73-74.)

that mark was entitled, the fact that Defendant signaled to consumers that its use of the word "Softhands" was entitled to trademark protection through its use of "TM" next to the word does not establish bad faith, under the circumstances.[19]

Similarly, the Court acknowledges that some of Defendant's employees distributed eighteen gloves containing the word "Softhands" (either on the glove or on a handtag) approximately a year after it was notified of Plaintiffs' trademark.  However, the Court has trouble finding bad faith solely from this fact.  Indeed, the fact that no products bearing the word "Softhands" were distributed for approximately one year after Defendant received the cease-and-desist letter suggests that the distribution of the eighteen gloves was merely an oversight.  *See Something Old, Something New, Inc. v. QVC, Inc.*, 98-CV-7450, 1999 WL 1125063, at *7 (S.D.N.Y. Dec. 7, 1999) ("[D]efendant's failure to completely abandon the use after receiving a cease and desist letter is insufficient to support an allegation of bad faith."); *Hi-Tech Pharm. Co., Inc. v. Hitech Pharm.*, 05-CV-2674, 2007 WL 1988737, at *36-37 (E.D.N.Y. July 5, 2007) (finding no bad faith despite the fact that defendant continued use of mark after receiving cease-and-desist letter).

For all of these reasons, the Court finds that this factor favors Defendant.

### vii.    Quality of Defendant's Product

"The quality of goods and services factor generally considers whether the senior user's reputation could be tarnished by inferior merchandise or services of the junior user."  *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp.2d 305, 340 (S.D.N.Y. 2010)

---

[19]    This is because, as the Art Director of Defendant's Marketing Services Department stated, Defendant "regularly uses a 'TM' symbol in connection with [Defendant's] technology names in logos and literature."  (Dkt. No. 27, at ¶ 11.)

(quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 [2d Cir. 1996]).

Here, the Court finds that Plaintiffs have failed to adduce admissible record evidence establishing that they suffered damage to their reputation as a result of Defendant's use of their logo.  The Court would add only that the fact that Defendant retired the "Softhands Construction" glove feature due to poor sales is not evidence that Plaintiffs' reputation was damaged by Defendant.

For this reason, the Court finds that this factor favors Defendant.

### viii.    Sophistication of Relevant Consumer Group

"[T]he analysis of consumer sophistication 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (quoting *The Sports Auth.*, 89 F.3d at 965).  "The level of sophistication, or lack thereof, can be proven either by direct evidence, such as with a survey or expert opinion, or the Court may rely on indirect indications of sophistication established by the nature of the product or its price." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp.2d 266, 286 (S.D.N.Y. 2006); *see also Patsy's*, 317 F.3d at 219 (noting that consumer sophistication is generally low in dealing with cheaper products or products sold in the rough-and-tumble world of the supermarket).  "However, even sophisticated consumers may be confused when two parties' marks and services are highly similar."  *New York Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp.2d 305, 320 (S.D.N.Y. 2010) (citing *The Morningside Group Ltd. v. Morningside Capital Group, LLC.*, 182 F.3d 133, 143 (2d Cir. 1999).

Baseball and softball gloves, such as those sold by Defendant, "typically" sell for more than $100 and for as much as $300.  (Dkt. No. 24, Attach. 1, at ¶ 102 [Def.'s Rule 7.1 Stmt.];

31

Dkt. No. 31, at 111 [Birmingham Tr.], 164 [testifying that he has seen Defendant's gloves for

sale for as little as $39 and as much as $300].)  By contrast, the retail price of Plaintiffs' training

device is $15.95 if bought directly from Plaintiffs, and "[i]n general . . . a little bit higher" if

purchased from a catalog or retail store.  (Dkt. No. 31, at 106-07 [Birmingham Tr.] [testifying

that the "Softhands" product is sold for a price "drastically lower" than competing training

devices].)  Simply put, the Court finds that there is a vast disparity between the price of the

products in question.

   In addition, although Plaintiffs' mark and Defendant's logo are very similar, the Court

finds that the physical appearance of the products is quite different.  Therefore, "unhurried

consumers in the relaxed environment" purchasing in a retail store, catalog or online may be

expected to exhibit sufficient sophistication necessary distinguish between the products.  *See*

*Star Indus., Inc.*, 412 F.3d at 390  (reasoning that consumers in a liquor store deciding on liquors

valued between $12 and $24 would be able to distinguish between the products in question).

Plaintiffs' have failed to adduce admissible record evidence establishing the contrary.  Instead,

Plaintiffs ask the Court to consider a hypothetical situation in which a sophisticated coach

advises an unsophisticated parent to purchase the "Softhands" product.  (Dkt. No. 22, Attach. 10,

at 24-25.)  Setting aside the fact that Plaintiffs have failed to adduce record evidence establishing

that this hypothetical situation has in fact occurred, the Court has serious doubts as to its

plausibility.  However, even assuming that such a scenario is plausible, in light of the differences

between the parties' products and the prices charged for them, the Court finds that the

introduction of the hypothetical scenario alone does not constitute sufficient record evidence

from which a rational factfinder could conclude that consumer sophistication is lacking to the

point that an unhurried consumer would not be able to distinguish Plaintiffs' training device

from Defendant's glove.

For these reasons, the Court finds that this factor weighs in favor of Defendant.

### 3.      Balance of Equities

After carefully balancing the above-discussed factors, the Court concludes that there

exists a substantial likelihood of confusion between Plaintiffs' mark and Defendant's use of the

word "Softhands" because (1) three of the factors favor finding a likelihood of confusion

between the marks, (while four factors favor a finding to the contrary, and one factor is neutral),

and (2) "[e]vidence of bad intent, . . . while potentially probative of the likelihood of confusion,

is simply not required in a trademark infringement case . . . ." *Star Fin. Servs., Inc. v. AASTAR*

*Mortg. Corp.*, 89 F.3d 5, 11 (1st Cir. 1996).

For these reasons, the Court grants Plaintiffs' motion for summary judgement on Counts

One and Two, and denies Defendant's cross-motion for summary judgement on Counts One and

Two.[20]

---

[20]      In their memorandum of law in opposition to Defendant's motion for summary
judgment, Plaintiffs argue, for the first time, that Defendant is alternatively liable under a theory
of "reverse confusion."  (Dkt. No. 52, Attach. 2, at 11-16.)  Plaintiffs further argue that, when
analyzing infringement under a theory of "reverse confusion," a court should apply some
modification to the traditional "likelihood of confusion" analysis.  (*Id*. at 13-14.)  As an initial
matter, Plaintiffs are correct that "reverse confusion" is not a new claim, but rather an alternative
theory of liability for infringement under the Lanham Act.  *See Trouble v. Wet Seal, Inc*., 179 F.
Supp.2d 291, 296 (S.D.N.Y. 2001) (noting that "allegations of forward confusion and reverse
confusion do not form distinct claims-they are alternative theories that can be used separately or
together in a trademark infringement claim under the Lanham Act").  However, because the
Court has already concluded that a "likelihood of confusion" exists under Plaintiffs' direct
confusion claim, the Court need not (and does not) analyze Plaintiffs' claim of reverse
confusion.  The Court will only note that "[t]he likelihood of reverse confusion is measured
according to the *Polaroid* factors . . . with . . . distinctions as to the first factor, the strength of the
plaintiff's mark, and the sixth factor, the defendant's good faith." *First Nat'l. Bank of Omaha,
Inc. v. Mastercard Int'l, Inc*., 03-CV-0707, 2004 WL 1575396, at *12 (S.D.N.Y. July 15, 2004)
(noting that, with regard to the first factor, "[a] plaintiff with a mark that is commercially weak .
. . is more likely to succeed in establishing reverse confusion [than direct confusion], particularly
against a defendant with a far stronger mark[,]" and, with regard to the sixth factor, because "it is
unlikely that a larger and better known junior user intends to trade on the reputation of the

### B.   Plaintiffs' Claim Under Federal Trademark Counterfeiting Act, 18 U.S.C. § 2320 (Count Four)

Section 2320 provides for criminal penalties and fines for the intentional trafficking of counterfeit goods or services.  18 U.S.C. § 2320.  Under this section, a "counterfeit mark" is a "spurious mark . . .  identical with, or substantively indistinguishable from" a registered trademark, "whether or not the defendant knew such mark was so registered . . . the use of which likely to cause confusion, to cause mistake, or to deceive."  18 U.S.C. § 2320(e)(1)(A)(i-iii).  Section 2320 makes it unlawful to intentionally traffic or attempt to traffic goods or services and "knowingly use[ ] a counterfeit mark on or in connection with such goods or services."  18 U.S.C. § 2320.

As explained above in Part III.A.2.b.ii. of this Decision and Order, while Defendant's logo is substantially similar to Plaintiffs' mark, it is not so "identical" to or  "substantially indistinguishable" from Plaintiffs' mark to support a counterfeiting claim.  As a result, Defendant's motion for summary judgement on this claim is granted.

### C.   Plaintiffs' Claim Under New York Trademark Dilution Law, N.Y. Gen. Bus. Law § 360, *et. seq.*

Count Five of Plaintiffs' Complaint requests relief for trademark dilution under N.Y. Gen. Bus. Law § 360, *et. seq.*  Under New York law, "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."  N.Y. Gen. Bus. Law § 360-l.  "Similar to federal trademark dilution law under 15

---

lesser-known plaintiff[,] [t]his factor is . . . less relevant in a reverse confusion inquiry").  As a result, to the extent that Plaintiffs' company is less powerful or recognizable in the marketplace than is Defendant's company (such that Plaintiffs' mark may be perceived as weak in comparison to Defendant's mark), it appears that Plaintiffs could nonetheless succeed on their claim of likelihood of confusion.

U.S.C. § 1125(c), [S]ection 360-l has been interpreted to provide for protection against both

dilution by blurring and tarnishment." *Starbucks Corp.*, 588 F.3d at 114 (citing *Hormel Foods*

*Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506-07 [2d Cir. 1996]).[21]  To establish liability on

this claim, Plaintiffs must show "(1) that the trademark is truly distinctive or has acquired

secondary meaning, and (2) a likelihood of dilution either as a result of 'blurring' or

'tarnishment.'"[22] *L & L Wings, Inc., v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 189 (S.D.N.Y.

2009) (quoting *U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp.2d 158, 175 [S.D.N.Y.

2001]); *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42 (2d Cir. 1994); *see also New York*

*Stock Exch., Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 557 (2d Cir. 2002) ("New

York law accords protection against dilution to marks that are distinctive as a result of acquired

secondary meaning as well as to those that are inherently distinctive.").

 Dilution by blurring occurs "where the defendant uses or modifies the plaintiff's

trademark to identify the defendant's goods and services, raising the possibility that the mark

will lose its ability to serve as a unique identifier of the plaintiff's product." *New York Stock*

*Exch., Inc.*, 293 F.3d at 558 (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 45-46 [2d

Cir. 1994]).  To determine the likelihood of blurring, the Second Circuit looks to the following

---

[21] However, unlike its federal counterpart, New York's trademark dilution law, "does not require a mark to be 'famous' for protection against dilution to apply." *Starbucks Corp.*, 588 F.3d at 114 (comparing 15 U.S.C. § 1125[c] with N.Y. Gen. Bus. Law § 360-l).

[22] Defendant argues that a third element–"predatory intent"–is *required* to prove trademark dilution.  (Dkt. No. 25, at 25 [Def.'s Memo. of Law].)  In support of its argument, Defendant cites *W.W.W. Pharm. Co.*, 984 F.2d at 576.  However, after issuing its decision in *W.W.W. Pharm. Co.* in 1993, the Second Circuit held in 1994 that predatory intent is "merely a factor relevant to a determination of dilution," not an "element." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 45-46 (2d Cir. 1994) (abrogating *W.W.W. Pharm. Co.* on this point of law in an effort to reduce the significance of predatory intent in the dilution analysis); *see also New York Stock Exch., Inc.*, 293 F.3d at 558 (listing predatory intent as one of six factors relevant to the dilution-by-blurring analysis); *Starbucks Corp.*, 588 F.3d at 114 (citing to *New York Stock Exch., Inc.*, for six-factor analysis authority).

six factors: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *New York Stock Exch., Inc.*, 293 F.3d at 558.  In addition, New York law does not permit a dilution claim unless the marks are "substantially" similar. *Starbucks Corp.*, 588 F.3d at 114 (quoting *Playtex Prods., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 167 [2d Cir. 2004]).

"Tarnishment occurs where a trademark is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *New York Stock Exch., Inc.*, 293 F.3d at 558 (quoting *Deere & Co.*, 41 F.3d at 43).

Here, for the reasons previously discussed above in Part III.A.2. of this Decision and Order, the Court finds that (1) Plaintiffs' mark has acquired the requisite secondary meaning in the marketplace, (2) Defendant's logo and Plaintiffs' mark are substantially similar, (3) the relevant consumers are sophisticated to the degree necessary to distinguish between the parties' products, and (4) a Defendant did not possess a predatory intent.  In other words, two of these factors weigh in favor of Plaintiff, and two weigh in favor of Defendant.  In addition, because Plaintiffs' product has been sold in the marketplace for more than twenty years and has been endorsed by a famous professional baseball player, a rational factfinder could conclude that it is renowned.  Finally, a rational factfinder could conclude that the "Softhands Construction" glove sold by Defendant was not renowned, i.e., did not reach a level of prominency or distinction, because (1) it was sold only for a limited duration (from 2003 to 2006), (2) Defendant stopped selling the product because of poor sales performance, and (3) Defendant acknowledges that, in the hierarchy of its products, technology names are of less significance than are "brand" names or "series" names, because technologies may not "stick around for a long time." (Dkt. No. 22,

Attach. 4, at 51-52 [Grapenthin Tr.].)

For these reasons, Defendant's motion for summary judgment on the issue of dilution by blurring is denied.

Finally, the Court rejects Plaintiffs' claim of dilution by tarnishment for two reasons: (1) Defendant manufactures quality gloves used by professional and amateur sports teams and athletes; and (2) although Defendant retired the "Softhands Construction" technology due to inadequate market performance, Plaintiffs have failed to adduce admissible record evidence establishing that Defendant's gloves in any way diminished the quality or prestige which the public may associate with Plaintiffs' product.  As a result, Defendant's motion for summary judgment on the issue of dilution by tarnishment is granted.

**D.      Plaintiffs' Claim Under New York Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 133**

In Count Six of their Complaint, Plaintiffs' allege that Defendant used its logo with the intent to deceive the public in violation of N.Y. Gen. Bus. Law § 133.  "To prevail [on this claim], Plaintiff[s] must show that (1) defendant used the mark, and (2) defendant acted in bad faith to deceive the public."  *L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 190 (S.D.N.Y. 2009); *see also Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 366-67 (S.D.N.Y. 2009) (stating that Plaintiffs must show an "intent to deceive").

For the reasons stated above in Part III.A.2.b.vi. of this Decision and Order, the Court agrees with Defendant that Plaintiff has failed to adduce admissible record evidence establishing that Defendant acted in bad faith to deceive the public, in using the "Softhands Construction" logo.  As a result, Defendant's motion for summary judgment on this claim is granted.

**E.      Plaintiffs' New York Common Law Claims of Unfair Competition and Trademark Infringement**

Count Seven of Plaintiffs' Complaint is for common law trademark infringement and

unfair competition.  The elements necessary to prevail on a common law cause of action for

trademark infringement are identical to the elements of a claim under the Lanham Act.  *See*

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 998 F. Supp. 322, 338 (S.D.N.Y. 1997)

(stating that a common law trademark infringement claim requires a showing of consumer

confusion and thus the analysis is the same as a claim under the Lanham Act); *L & L Wings, Inc.*,

676 F. Supp.2d at 191 ("Once a defendant has been shown to have committed infringement

under the Lanham Act, he has necessarily also done so under New York State and common

law.").  As a result, for the reasons stated above in Part III.A.2. of this Decision and Order,

Defendant's motion for summary judgment on Plaintiffs' claim for common law trademark

infringement is denied.

    However, with regard to Plaintiff's claim of unfair competition, such a claim under New

York law requires an additional element of bad faith or intent.[23]  Here, for the reasons stated

above in Part III.A.2.b.vi. of this Decision and Order, the Court agrees with Defendant that

Plaintiff has failed to adduce admissible record evidence establishing that Defendant acted in bad

faith, or with intent, in using the "Softhands Construction" logo.  As a result, Defendant's

motion for summary judgment on this claim is granted.

## IV.    PLAINTIFFS' REQUEST FOR EQUITABLE RELIEF

    As relief for Defendant's infringement, Plaintiffs request, among other things, that the

Court permanently enjoin Defendant's use of the word "Softhands" and order Defendant to

destroy all materials bearing the word "Softhands."

    "Courts have the authority to grant injunctive relief under the Lanham Act 'according to

---

[23]    *Franklin Res., Inc.*, 988 F. Supp. at 338-39 ("[U]nder New York law, the essence
of unfair competition . . . is the bad faith misappropriation of the labors and expenditures of
another, likely to cause confusion or to deceive purchasers as to the origin of the goods.");
*Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) (noting that, while
"state law claim of unfair competition is not viable without a showing of bad faith[,]" . . . a
plaintiff may recover for unfair competition in violation of federal law without a showing of bad
faith").

the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation' of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under Section 43(a) of the Lanham Act." *Philip Morris USA Inc. v. A & V Minimarket, Inc.*, 592 F. Supp. 2d 669, 675 (S.D.N.Y. 2009) (quoting 15 U.S.C. § 1116[a]). "In general, a plaintiff may obtain a permanent injunction if it shows (1) actual success on the merits and (2) irreparable harm." *A & V Minimarket, Inc.*, 592 F. Supp. 2d at 675 (internal quotation marks omitted). "In the context of trademark infringement and false designation of origin claims, the second prong is automatically satisfied by actual success on the merits, [because] irreparable harm is established by a showing of likelihood of confusion." *Chloe*, 2009 WL 1227927, at *11. In addition, the Court notes that the scope of a permanent injunction may include a recall order. *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 97 (2d Cir. 1993) ("The district court has broad discretion as to recall orders which are part of permanent injunctions.")

Because Plaintiffs have prevailed on their claims of infringement under Lanham Act, the Court finds they are entitled to injunctive relief. As a result, Defendant is permanently enjoined from using the word "Softhands" in connection with the offering of goods and services contained in the category designated as "International Class 28–Toys and Sporting Goods," including, but not limited to, baseball and softball equipment and training devices. In addition, Defendant is ordered to use its best efforts, on a continuing basis, to withdraw the offending materials from all retailers and destroy all of its products, labels, advertisements and other materials in the marketplace bearing the word "Softhands."[24]

---

[24]     Defendant need not undertake efforts to recall gloves bearing the word "Softhands" from customers (as opposed to resellers) who purchased the gloves before 2009. The Court reaches this conclusion for three reasons: (1) any harm that Plaintiffs suffered from those sales has already occurred, (2) the gloves did not sell well, and thus it stands to reason that they are not in wide circulation, and (3) practically speaking, the likelihood of recovering gloves

## V.     PLAINTIFFS' REQUEST FOR MONETARY RELIEF AND FEES

In addition to their request for an injunction, in their Complaint Plaintiffs also request

attorneys' fees, Defendant's profits, and actual and punitive damages.  Pursuant to 15 U.S.C. §

1117, a plaintiff may be entitled to (1) defendant's profits, (2) any damages that he or she

sustained, and/or (3) the costs of the action.  15 U.S.C. § 117(a).  "Generally, to receive

compensation, a plaintiff must specify that a specific injury or profitable infringement occurred."

*"Cuse" Road Dawgs, Inc.*, 679 F. Supp. 2d at 293 ("In other words, the discretionary award of

damages based on either harm suffered by plaintiff or defendant's profits must rest on an

evidentiary basis that an injury or profitable infringement has already been suffered.").  In

addition, "it is well settled that in order for a Lanham Act plaintiff to receive an award of

damages the plaintiff must prove either actual consumer confusion or deception resulting from

the violation, or that the defendant's actions were intentionally deceptive thus giving rise to a

rebuttable presumption of consumer confusion."  *George Bash Co. v. Blue Coral, Inc.*, 968 F.2d

1532, 1537 (2d Cir. 1992) *cert. denied*, 506 U.S. 991 (1992).

Here, as an initial matter, the Court finds that Plaintiffs have failed to adduce record

evidence establishing that they suffered lost profits as a result of Defendant's infringement.  In

addition, as stated above in Parts III.A.2.b.v. and III.A.2.b.vi. of this Decision and Order,

Plaintiffs have failed to adduce admissible record evidence establishing actual consumer

confusion,[25] or that Defendant acted with willful or intentional deception.  As a result, Plaintiffs'

---

from customers who purchased them between 2003 and 2006, the years in which they were
manufactured, is low.

[25]     Aside from the e-mail correspondence with John Schulte (which the Court finds
to be insufficient to support a finding of actual consumer confusion), Plaintiffs concede that any
other direct evidence of actual consumer confusion would be "anecdotal."  (Dkt. No. 22, Attach.
10, at 25.)

request for Defendant's profits derived from its sale of gloves bearing the word "Softhands" is denied.

Finally, with regard to Plaintiffs' request for attorney's fees, "only in 'exceptional' infringement cases will courts award reasonable attorney's fees." *"Cuse" Road Dawgs, Inc.*, 679 F. Supp. 2d at 293-94 (quoting 15 U.S.C. § 117[a]). "Exceptional cases are those where 'deliberate and flagrant' infringement has occurred." *Id.* (quoting *Vuitton Et Fils, S.A. v. Crown Handbags*, 492 F. Supp. 1071, 1077 [S.D.N.Y. 1979]). Because the Court has already concluded that Defendant did not act in bad faith, the Court denies Plaintiffs' request for attorneys' fees and costs.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiffs' motion for partial summary judgment (Dkt. No. 22) is **<u>GRANTED</u> in part and <u>DENIED</u> in part** in the following respects;

(1) Plaintiffs' motion for summary judgment is **<u>GRANTED</u>** with regard to their claims for (a) trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count One), and (b) false designation of origin under the Lanham Act, 15 U.S.C. § 1125 (Count Two); and

(2) Plaintiffs' motion for summary judgment is **<u>DENIED</u>** with regard to Plaintffs' claim for manufacture, distribution and sale of counterfeit goods under the Lanham Act, 15 U.S.C. §§ 1114 and 1116 (Count Three); and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 23) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part** in the following respects:

(1) Defendant's motion for summary judgment is **<u>GRANTED</u>** with regard to

Plaintiffs' claims for (a) manufacture, distribution and sale of counterfeit goods under the Lanham Act, 15 U.S.C. §§ 1114 and 1116 (Count Three), (b) violation of 18 U.S.C. § 2320, the federal Trademark Counterfeiting Act of 1984 (Count Four), (c) trademark dilution by tarnishment under N.Y. Gen. Bus. Law § 360 (Count Five), (d) violation of N.Y. Gen. Bus. Law § 133, the New York Deceptive Trade Practices Act (Count Six), and (e) unfair competition (Count Seven), so that these claims are **<u>DISMISSED</u>**; and

(2) Defendant's motion for summary judgment is **<u>DENIED</u>** with regard to Plaintiffs' claims for (a) trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count One), (b) false designation of origin under the Lanham Act, 15 U.S.C. § 1125 (Count Two), (c) trademark dilution by blurring under N.Y. Gen. Bus. Law § 360 (Count Five), and (d) trademark infringement under New York common law (Count Seven), so that these claims survive Defendant's motion for summary judgment; and it is further

**ORDERED** that a permanent injunction be issued against Defendant, its agents, servants, distributors, retailers, employees, successors and assigns and all others in concert and privity with it from using Plaintiffs' registered mark "Softhands" in connection with the offering of goods and services contained in the category designated as "International Class 28–Toys and Sporting Goods," including, but not limited to, baseball and softball equipment and training devices; and it is further

**ORDERED** that Defendant use its best efforts, on a continuing basis, to withdraw the offending materials from all retailers and destroy all of its products, labels, advertisements and other materials in the marketplace bearing the word "Softhands"; and it is further

**ORDERED** that Plaintiffs' request for monetary damages, attorney's fees and costs under the Lanham Act is **DENIED**; and it is further

**ORDERED** that counsel are directed to appear on **MAY 5, 2011 at 2:00 p.m.** in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **April 14, 2011**, and the parties are directed to engage in **meaningful** settlement negotiations prior to the 5/5/11 conference.

Dated: March 31, 2011
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge